126 P.3d 802 (2006)
CITY OF OLYMPIA, a Washington code city, Petitioner,
v.
John DREBICK and Jane Doe Drebick, husband and wife, d.b.a. Drebick Investments, Respondents.
No. 75270-2.
Supreme Court of Washington, En Banc.
Argued February 8, 2005.
Decided January 19, 2006.
*803 David John Lenci, Julie Anne Halter, Preston Gates & Ellis LLP, Seattle, Mr. Jeffrey Scott Myers, Law Lyman Daniel Kamerrer, et al, Mr. Bob C. Sterbank, Mr. John Edward Vanek, City of Olympia, Olympia, for Petitioner/Appellant.
Alexander Weal Mackie, Perkins Coie LLP, Olympia, Eric S Merrifield, Perkins Coie LLP, Seattle, for Appellee/Respondent.
Kristopher Ian Tefft, Ass'n of Wash. Business, Olympia, for Amicus Curiae (Building Industry Ass'n of Wash.)
Russell Clayton Brooks, Bellevue, Robin L Rivett, Pacific Legal Foundation, Sacramento, Samuel A. Rodabough, Groen Stephens & Klings LLP, Bellevue, for Amicus Curiae (Pacific Legal Foundation).
Marilee Jones Scarbrough, Wash. State School Directors' Ass'n, Olympia, for Amicus Curiae (Wash. State School Directors Ass'n.)
OWENS, J.
¶ 1 The City of Olympia (the City) seeks reversal of a Court of Appeals decision that invalidated the City's calculation of a transportation impact fee imposed on a commercial developer, Drebick Investments (Drebick). At issue is whether the City's impact fee ordinances comply with the impact fee statutes, RCW 82.02.050-.090, of the Growth Management Act (GMA), chapter 36.70A RCW. We hold that, contrary to the city hearing examiner's interpretation, the GMA impact fee statutes do not require local governments to calculate an impact fee by making individualized assessments of the new development's direct impact on each improvement planned in a service area. We reverse the decision of the Court of Appeals.

FACTS
¶ 2 In July 1998, Drebick sought approval from the City for construction of a four-story, 54,000-square-foot office building within the city limits. The City approved the proposal, subject to Drebick's payment of a transportation impact fee of $132,328.98, calculated according to the City's legislatively adopted fee schedule. See former Olympia Municipal Code (OMC) 15.06, 15.10, 15.14, 15.18 (1999). In February 1999, Drebick sought a fee adjustment by submitting an independent fee calculation, as permitted in former OMC 15.10.020, but two months later the City's director of community planning and development rejected Drebick's alternative calculations, concluding that they did not meet the requisite accuracy and reliability criteria of former OMC 15.10.020D.
¶ 3 Drebick appealed the director's decision to the city hearing examiner, and hearings were held on four days in May and June 2000. In November 2000, the hearing examiner reversed the City, and the City sought review in Thurston County Superior Court under the Land Use Petition Act (LUPA), *804 chapter 36.70C RCW. The superior court reversed the hearing examiner's decision, and we then denied Drebick's request for direct review in this court. The Court of Appeals thereafter reversed the superior court and remanded the matter to the City for a recalculation of the impact fee. City of Olympia v. Drebick, 119 Wash.App. 774, 83 P.3d 443 (2004). We granted the City's petition for review.

ISSUE
¶ 4 In calculating the transportation impact fees imposed on the Drebick development, did the City comply with the statutory standards set forth in RCW 82.02.050-.090 for apportioning such fees?

ANALYSIS
¶ 5 Standard of Review. At issue are the hearing examiner's interpretation of the impact fee statutes, RCW 82.02.050-.090, and his conclusion of law that, in calculating the impact fees imposed on Drebick, the City failed to comply with the requirements of RCW 82.02.050(3).[1] In its LUPA petition, the City asserted that the hearing examiner's decision was "based on erroneous interpretations of law." Clerk's Papers (CP) at 10-11; see RCW 36.70C.130(1)(b) (providing relief where party establishes that "land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise"). This court reviews issues of statutory interpretation and claimed errors of law de novo. Dep't of Ecology v. Campbell & Gwinn, L.L.C., 146 Wash.2d 1, 9, 43 P.3d 4 (2002); Pinecrest Homeowners Ass'n v. Glen A. Cloninger & Assocs., 151 Wash.2d 279, 290, 87 P.3d 1176 (2004).
¶ 6 Principles of Statutory Interpretation. The aim of statutory interpretation is "to discern and implement the intent of the legislature." State v. J.P., 149 Wash.2d 444, 450, 69 P.3d 318 (2003); Campbell & Gwinn, 146 Wash.2d at 9, 43 P.3d 4. A reviewing "court is required, whenever possible, to give effect to every word in a statute." Dennis v. Dep't of Labor & Indus., 109 Wash.2d 467, 479, 745 P.2d 1295 (1987). Where the meaning of a provision is "plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." Campbell & Gwinn, 146 Wash.2d at 9-10, 43 P.3d 4. A provision's plain meaning may be ascertained by an "examination of the statute in which the provision at issue is found, as well as related statutes or other provisions of the same act in which the provision is found." Id. at 10, 43 P.3d 4 (citing, inter alia, C.J.C. v. Corp. of the Catholic Bishop of Yakima, 138 Wash.2d 699, 708-09, 985 P.2d 262 (1999) (stating that "[r]elated statutory provisions are interpreted in relation to each other and all provisions harmonized")); see also State v. Clausing, 147 Wash.2d 620, 630, 56 P.3d 550 (2002) (Owens, J., dissenting) (noting that "[a]pplication of the statutory definitions to the terms of art in a statute is essential to discerning the plain meaning of the statute"). Only when the plain, unambiguous meaning cannot be derived through such an inquiry will it be "appropriate [for a reviewing court] to resort to aids to construction, including legislative history." Campbell & Gwinn, 146 Wash.2d at 12, 43 P.3d 4.
¶ 7 Impact Fees under the GMA. In 1990, the legislature enacted RCW 82.02.050-.090 as part of the GMA, authorizing local governments to condition the approval of development *805 proposals on the payment of "impact fees" to defray a portion of the costs arising from "new growth and development." RCW 82.02.050(1)(a). The legislature expressly stated that its "intent" is "[t]o ensure . . . adequate facilities . . . to serve new growth and development; . . . [t]o promote orderly growth and development by establishing standards by which [local governments] may require, by ordinance, that new growth and development pay a proportionate share of the cost of the new facilities needed to serve new growth and development; and . . . [t]o ensure that impact fees are imposed through established procedures and criteria so that specific developments do not pay arbitrary fees or duplicative fees for the same impact." Id. subsection (1)(a)-(c). Thus, by enacting the impact fee statutes, the legislature intended to enable towns, cities, and counties to plan for "new growth and development" and to recoup from developers a predictable share of the infrastructure costs attributable to the planned growth, with the qualification that the local government's "procedures and criteria" were to protect "specific developments" from impact fees that were "arbitrary" or that "duplicat[ed]" the amount paid for "the same impact."
¶ 8 Just as RCW 82.02.050(1)(a)-(c) distinguishes "specific developments" from, in general, "new growth and development," subsection (2) authorizes local governments to impose impact fees on particular "development activity" as a means of financing the "system improvements" planned to accommodate overall "new development" in a defined service area:
Counties, cities, and towns that are required or choose to plan under RCW 36.70A.040 are authorized to impose impact fees on development activity as part of the financing for public facilities, provided that the financing for system improvements to serve new development must provide for a balance between impact fees and other sources of public funds and cannot rely solely on impact fees.
(Emphasis added.) The definition in RCW 82.02.090(1) leaves no doubt that "[d]evelopment activity" refers to the particular new development seeking approval: "`Development activity' means any construction or expansion of a building, structure, or use, any change in use of a building or structure, or any changes in the use of land, that creates additional demand and need for public facilities." RCW 82.02.050(2) therefore authorizes local governments, planning under the GMA, to impose impact fees on individual developments to cover the increased demand for roads, parks, schools, or fire stations identified in the capital facilities plan for a designated service area.[2]
¶ 9 The legislature provided two overlapping definitions of "impact fees." First, setting forth three limitations on such fees, RCW 82.02.050(3) mandates that they
(a) Shall only be imposed for system improvements that are reasonably related to the new development;

(b) Shall not exceed a proportionate share of the costs of system improvements that are reasonably related to the new development; and
(c) Shall be used for system improvements that will reasonably benefit the new development.

(Emphasis added.) Compressing (a)-(c), RCW 82.02.050(3) explains that impact fees "[s]hall only be imposed for [a proportionate share of the costs of] system improvements that are reasonably related to [and reasonably beneficial to] the new development." That, here, the statute speaks of "the new development," (emphasis added) as opposed to "new growth and development" or "new development" (as in the preceding section.050(1) and (2)), indicates that "the new development" is synonymous with the "development activity"that is, with the particular new development seeking approval. See Cowiche *806 Growers, Inc. v. Bates, 10 Wash.2d 585, 618, 117 P.2d 624 (1941) (Simpson, J., dissenting) (noting that the use of the definite article has a "`specifying or particularizing effect'" (quoting 1 WORDS AND PHRASES 1 (perm.ed., n.d.))); Dennis, 109 Wash.2d at 479, 745 P.2d 1295 (requiring courts "to give effect to every word in a statute").
¶ 10 The definition of impact fees in RCW 82.02.090(3) echoes the criteria set forth in 82.02.050(3)(a)-(c) and establishes that the phrase "the new development" means the individual development seeking approval: "`Impact fee' means a payment of money imposed upon development as a condition of development approval to pay for public facilities needed to serve new growth and development, and that is reasonably related to the new development that creates additional demand and need for public facilities, that is a proportionate share of the cost of the public facilities, and that is used for facilities that reasonably benefit the new development." (Emphasis added.) Requiring that the impact fee be "reasonably related to the new development that creates additional demand and need for public facilities," the RCW 82.02.090(3) definition grafts onto "the new development" the definition of "development activity" (a term indisputably denoting the particular development); the legislature thus identified "the new development" as the individual development seeking approval. Moreover, the refund provision plainly equates the beneficiary of the system improvements with the particular new development seeking approval; RCW 82.02.080(1) refers to the local government's six-year window for spending the impact fees "on public facilities intended to benefit the development activity for which the impact fees were paid." (Emphasis added.) In sum, we conclude that, in RCW 82.02.050(3) and 82.02.090(3), the legislature unambiguously provided that the impact fees were to be a "proportionate share" of the costs of "system improvements" (that is, roads, parks, schools, or fire stations identified in the capital facilities plan) that are "reasonably related to" and "reasonably benefit" the particular development seeking approval.[3]
¶ 11 The question, then, is what the legislature intended when it required that the facilities funded by impact fees be reasonably related and beneficial to the particular development seeking approval. To discern the legislature's intended meaning, we must turn, in the first instance, to "related statutes or other provisions of the same act." Campbell & Gwinn, 146 Wash.2d at 10, 43 P.3d 4. The legislature declared at the outset its aim of "establishing standards" by which local governments could impose impact fees. RCW 82.02.050(1)(b). Those standards, most of which are spelled out in RCW 82.02.060, presumably enable local governments to arrive at fees that satisfy the criteria of RCW 82.02.050(3). The primary standard prescribed by the legislature is the local government's creation of a fee schedule: "The local ordinance by which impact fees are imposed . . . [s]hall include a schedule of impact fees . . . for each type of development activity that is subject to impact fees, specifying the amount of the impact fee to be imposed for each type of system improvement. The schedule shall be based upon a formula or other method of calculating such impact fees." RCW 82.02.060(1) (emphasis added). The legislature further prescribed that the local government's impact fee ordinance "[s]hall establish one or more reasonable service areas within which it shall calculate and impose impact fees for various land *807 use categories per unit of development." RCW 82.02.060(6) (emphasis added). The legislature thus indicated that a reasonable relationship would be achieved between the funded improvements and the individual development if the local government defined a reasonable service area, identified the public facilities therein that would require improvement over a span of six years, and prepared a fee schedule taking into account the type and size of the development seeking approval as well as the type of public facility being funded.
¶ 12 Other provisions in the GMA impact fee statutes support the conclusion that the legislature authorized local governments to calculate the fees by tying the particular development to the service area's improvements as a whole, not to particular system improvements within the service area. First, RCW 82.02.060(4) and (5) provide that the local government's impact fee ordinance must "allow the county, city, or town . . . to adjust the standard impact fee . . . to consider unusual circumstances in specific cases" and to consider "studies and data submitted by the developer." These provisions, in conjunction with the requirements of the fee schedule, serve the legislature's aim of "ensur[ing] that impact fees are imposed through established procedures and criteria so that specific developments do not pay arbitrary fees or duplicative fees for the same impact." RCW 82.02.050(1)(c). Just as the very existence of section .060(4) and (5) underscores that a particular development's impact fee is the product of a predetermined schedule for the service area, the distinction between "system improvements" and "project improvements" likewise makes it clear that a particular development's impact fee is computed with reference to all improvements in the service area, not simply with regard to those individual projects that the particular development directly affects. See supra note 2.
¶ 13 By requiring a general fee schedule for planned, systemwide improvements and allowing individualized fee calculations as an exception, the legislature distinguished the impact fee statutes from the regulatory fees referred to in RCW 82.02.020:
Except as provided in RCW 82.02.050 through 82.02.090, no county, city, town, or other municipal corporation shall impose any tax, fee, or charge, either direct or indirect, on the construction or reconstruction of residential buildings, commercial buildings, industrial buildings, or on any other building or building space or appurtenance thereto, or on the development, subdivision, classification, or reclassification of land. However, this section does not preclude dedications of land . . . within the proposed development . . . which the county, city, town, or other municipal corporation can demonstrate are reasonably necessary as a direct result of the proposed development. . . .
This section does not prohibit voluntary agreements with counties, cities, towns, or other municipal corporations that allow a payment in lieu of a dedication of land or to mitigate a direct impact that has been identified as a consequence of a proposed development. . . .
(Emphasis added.) GMA impact fees are likewise distinct from those exacted under the State Environmental Policy Act (SEPA), chapter 43.21C RCW, which authorizes local jurisdictions to impose conditions on a proposed development "to mitigate specific adverse environmental impacts." RCW 43.21C.060 (emphasis added). Similarly, the local transportation act (LTA), chapter 39.92 RCW, limits the fee to "the amount that the local government can demonstrate is reasonably necessary as a direct result of the proposed development." RCW 39.92.030(4) (emphasis added). Notably, in the GMA impact fee statutes, the legislature did not require that the funded facilities be directly or specifically related and beneficial to the development seeking approval. Whereas the starting point in the calculation of SEPA or LTA fees is the individual development and its direct impact, the local government's calculation of a proposed development's GMA impact fee begins, in contrast, with the anticipation of the area-wide improvements needed to serve new growth and development in the aggregate.
¶ 14 Ignoring the distinction between impact fees under RCW 82.02.050-.090 and land *808 dedications under RCW 82.02.020, the dissent takes the contrary view that local governments must base GMA impact fees on individualized assessments of the direct impacts each new development will have on each improvement planned in a service area. To advance this claim, the dissent resorts to inapposite legislative history. See supra note 3. According to the dissent, "[t]he legislative history, well documented by the Court of Appeals, conclusively demonstrates" the legislature's intent that "the Nollan/Dolan standard"drawn from two Fifth Amendment physical takings cases, the latter postdating the GMA"be applied with regard to RCW 82.02.050(3)(a)-(c)." Dissent at 14-15 & n.11 (emphasis added) (citing Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); Dolan v. City of Tigard, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994)). The dissent does not explain that neither Nollan nor Dolan concerned the imposition of impact fees but addressed instead the authority of a local government to condition development approval on a property owner's dedication of a portion of land for public use; nor does the dissent mention that neither the United States Supreme Court nor this court has determined that the tests applied in Nollan and Dolan to evaluate land exactions must be extended to the consideration of fees imposed to mitigate the direct impacts of a new development, much less to the consideration of more general growth impact fees imposed pursuant to statutorily authorized local ordinances. See City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 702-03, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999) (noting that the Court has "not extended the rough-proportionality test of Dolan beyond the special context of exactions-land-use decisions conditioning approval of development on the dedication of property to public use"). For the proposition that the Nollan-Dolan standard should apply to GMA impact fees, the dissent inaptly cites decisions from other jurisdictions applying that standard to direct mitigation fees of the type referred to in RCW 82.02.020 (that is, to fees in lieu of possessory exactions), not to the legislatively prescribed development fees at issue here.[4]
¶ 15 Nevertheless, despite the absence of any link between the Nollan-Dolan standard and the impact fees authorized in RCW 82.02.050-.090, the dissent identifies, as "the most important conclusion to be drawn from the legislative history," "the legislature's deliberate use of the identical terms [used by the Nollan Court] to describe the `nexus' requirement of the Fifth Amendment: `reasonably related to.'" Dissent at 817 (citing Drebick, 119 Wash.App. at 785, 83 P.3d 443 (quoting Nollan, 483 U.S. at 838, 107 S.Ct. 3141)). First, to be clear, the Court of Appeals pointed to nothing in the legislative history that referred to the Nollan test, much less anything revealing that legislators had considered and deliberately applied language drawn from Nollan. Second, given that the legislature has used the phrase "reasonably related to" in literally dozens of statutes, its use of the phrase in the impact fee statutes could not be less remarkable; certainly, the presence of this commonplace standard does not, as the dissent claims, "conclusively demonstrate[ ]" the legislature's "deliberate use" of the Nollan standard.[5] Finally, we find equally flawed the *809 dissent's claim that "the definition of `proportionate share' in RCW 82.02.090(5) supports the conclusion that the legislature intended the Nollan definition of `reasonably related.'" Dissent at 818. The dissent states that the "definition clearly defines the amount of impact fees that can be charged in relation to the specific proposed development," but here the dissent rewrites the provision, which refers to "the service demands and needs of new development"not "the new development," as the dissent interprets it. Id. (second emphasis added). In sum, legislative history provides no support for the dissent's claim that, by using the term "reasonably related to," the legislature manifested its intention to require local governments to calculate GMA impact fees by making individualized assessments of each proposed development's direct impact on each improvement planned in a service area.
¶ 16 The City's Calculation of Transportation Impact Fees. Exercising the authority granted in RCW 82.02.050(2) and adhering to the requirements of RCW 82.02.060, the City adopted its transportation impact fee ordinances, codified in former OMC 15.06, 15.10, 15.14, and 15.18. As permitted in RCW 82.02.060(6), the City "elected to base its fee structure on a single service area coterminous with its Urban Growth Area." Admin. R. at 6. Having reviewed the City's method of calculating transportation impact fees, the hearing examiner summarized the City's method as follows:
(a) Project the cost of the transportation improvement projects in the UGA needed to provide capacity for new growth over the six-year period from 1994 to 2000. This estimate does not include the cost of improvements to address existing deficiencies and has been reduced to account for the percentage of pass-through traffic and funds expected from grants and various other sources.
(b) Project the total number of new, afternoon peak-hour trips with at least one end in the UGA during the same six-year period.
(c) Divide the projected cost from (a) by the projected number of trips in (b) for the average cost of a new trip in the UGA over the six-year period.
(d) Convert this average cost into impact fees for specific types and sizes of development by considering the number of vehicle trips entering or leaving the land use at issue during the afternoon peak hour, the varying trip lengths generated by different land uses, and the percentage of "pass-by" trips.
CP at 21. In former OMC 15.18.010, the City set forth the resulting fee schedule, as required in RCW 82.02.060(1). In compliance with RCW 82.02.060(4) and (5), former OMC 15.10.020 allowed individual developers to request departures from the fee schedule and permitted the City to consider independent fee calculations on a case-by-case basis.[6]
¶ 17 The hearing examiner then made the following findings regarding the City's legislatively adopted fee schedule:
34. Under the method used by Olympia to calculate transportation impact fees, the impact fee assessed a specific development is proportionate to and reasonably related to the jurisdiction-wide need for new transportation improvements created by that development.

35. Every land use benefits in a general sense from a smoothly functioning transportation system with adequate capacity in the jurisdiction in which it is located. Under Olympia's method the transportation impact fee assessed a specific development is used for improvements that will reasonably benefit that development, if benefit is judged by the effect of the transportation improvements in the jurisdiction as a whole.

CP at 22 (emphasis added). Paraphrasing his findings, the hearing examiner repeated that "the Drebick fee is proportionate to and reasonably related to the demand for new *810 capacity improvements considered as a whole" and that "those improvements considered as a whole will benefit the Drebick development." Id. at 32 (emphasis added). The hearing examiner's reference to "the jurisdiction-wide need for new transportation improvements," "the transportation improvements in the jurisdiction as a whole," and "improvements considered as a whole" is consistent with the statute's definition of "system improvements" as those "public facilities. . . designed to provide service to service areas within the community at large, in contrast to project improvements." RCW 82.02.090(9). The City permissibly defined its "service area" as the City's urban growth area, a fact that explains the hearing examiner's use of the words "jurisdiction-wide" and "jurisdiction." The hearing examiner thus found that the City's method for calculating transportation impact fees met the statutory requirement that "system improvements" be "reasonably related to" and "reasonably benefit" the specific development. RCW 82.02.050(3)(a)-(c), .090(9).
¶ 18 The dissent takes issue with the City's designation of a single service area. However, RCW 82.02.060(6) mandates that a local government's impact fee ordinance must "establish one or more reasonable service areas." (Emphasis added.) Moreover, nowhere in the hearing examiner's findings and conclusions was the City's compliance with RCW 82.02.060(6) questioned. See CP at 13-48. Indeed, in the only finding touching on the reasonableness of the City's designation of a single service area, the hearing examiner stated that the City's traffic consultant had found "the use of a jurisdiction-wide average cost as the basis for the impact fee rates . . . justified, because the City's relatively compact geography matched closely with the average trip lengths, such that in most cases an average trip would traverse a good portion of the City boundaries." Id. at 22 (emphasis added). Nevertheless, proceeding as though the reasonableness of the service area were an issue before this court, the dissent attacks the City's designation and, in a hallucinatory sequence, actually likens Olympia to the San Juan Islands. See dissent at 12-13. The dissent disregards the qualification in RCW 82.02.090(8) that "[s]ervice areas shall be designated on the basis of sound planning or engineering principles." (Emphasis added.) Were we called upon to review a city's compliance with that statutory requirement, we would doubtless rely on evidence previously provided by city planners, engineers, and other experts, not on the deployment of our own strained hypotheticals. We also note that, while the definition of "[s]ervice area" requires that the "public facilities" within the designated area "provide service to development within the area," that requirement simply does not mean, as the dissent contends, that for a service area to be reasonable each public facility in the service area must directly serve each new development project. RCW 82.02.090(8). The dissent's contention rests on the insupportable notion that "development within the area" does not mean area-wide development but means instead the particular new "development" project seeking approval "within the area." In the dissent's view, the only "reasonable" service area would be one no larger than the project site for the new development seeking approval, but the statutory scheme clearly distinguishes between project sites and service areas.[7]
¶ 19 The hearing examiner's inquiry should have ended with his factual findings that "the Drebick fee is proportionate to and reasonably related to the demand for new capacity improvements considered as a whole" and that "those improvements considered as a whole will benefit the Drebick development." CP at 32 (emphasis added). However, the hearing examiner went on to hold that the City's calculations violated RCW 82.02.050(3) *811 because Drebick's impact fee was not "reasonably related to the service demands or needs created by the Drebick proposal on each of the individual project groups on which the impact fees [were] based." CP at 22 (emphasis added); see supra note 6. But as discussed above, nothing in the plain language of the GMA impact fee statutes supports the hearing examiner's view that the City was required to calculate Drebick's impact fees by individually assessing his development's direct, specific impact on each of the improvements listed in the City's capital facilities plan.
¶ 20 Nor is there any support to be found in prior cases interpreting the impact fee statutes. In New Castle Investments v. City of LaCenter, 98 Wash.App. 224, 989 P.2d 569, review denied, 140 Wash.2d 1019, 5 P.3d 9 (2000), a developer challenged the applicability of the city's GMA impact fee ordinance on the grounds that it was adopted two days after the proposed development was approved. The developer argued that, under the vesting statute (RCW 58.17.033), the development was subject only to the "land use control ordinances" in effect at the time the application was perfected. Division Two concluded, however, that the GMA impact fees' "resemblance to taxes" removed them from the definition of "`land use control ordinance.'" Id. at 235, 989 P.2d 569. Noting that the GMA impact fee statutes were "codified among excise taxes in RCW 82," the New Castle court distinguished the fees from the regulatory exactions of SEPA, the LTA, and RCW 82.02.020: "By the clear language of the statute, GMA impact fees are not intended to compensate local governments for the direct impacts of specific development projects on specific components of local infrastructure systems or to finance programs that regulate development." Id. at 235-36, 989 P.2d 569 (emphasis added). In Wellington River Hollow, L.L.C. v. King County, 121 Wash.App. 224, 54 P.3d 213 (2002), review denied, 149 Wash.2d 1014, 70 P.3d 965 (2003), Division One of the Court of Appeals agreed with the New Castle court's interpretation of RCW 82.02.050(3) and rejected a developer's claim that school impact fees imposed on a proposed apartment complex had to "specifically benefit" the students generated by the development. Id. at 237, 989 P.2d 569.

CONCLUSION
¶ 21 The GMA impact fee statutes permit local governments to base impact fees on area-wide infrastructure improvements reasonably related and beneficial to the particular development seeking approval. We agree with the superior court's conclusion that "this `rational' [or `relational'] standard . . . [is] broader than the standard under [SEPA or the LTA]." CP at 674. As the superior court correctly determined, the hearing examiner erred in concluding that the GMA impact fee statutes required the City to calculate Drebick's impact fee by making individualized assessments of the Drebick development's direct impact on each improvement planned in a service area. We hold that the City's method for calculating transportation impact fees complied with the plain language of the GMA impact fee statutes. We therefore reverse the Court of Appeals.
C. Johnson, Madsen, Bridge, Fairhurst, JJ. and Becker, J.P.T. concur.
SANDERS, J. (dissenting).
¶ 22 The City of Olympia (City) claims the fees at issue here "are, in essence, excise taxes on new development generally . . ."[1] "because the ultimate purpose of the fees is to generally raise revenue to fund needed public facilities and infrastructure."[2] I agree. The resulting problem for the City is therefore twofold: (1) the City has not been statutorily authorized to impose an excise tax on new development and (2) the City has been specifically prohibited by RCW 82.02.020 from doing just that. To put it simply, the only way these fees could pass statutory, much less constitutional,[3] muster is *812 that they be true "impact fees" as that term is defined and limited by the legislature, which excise taxes clearly are not.
¶ 23 Having stated the general proposition, I repair to the facts which demonstrate these fees are indeed excise taxes on new construction, precisely as contended by the City.
¶ 24 In 1998 petitioner Drebick Investments (Drebick) sought land use approval from the City to construct a four-story office building complex at a corner of the city boundary near an exit to Highway 101. The municipality imposed a $132,000 traffic fee as a condition to new development based upon contemplated cost of citywide traffic projects without regard to the specific impact the Drebick development might or might not have on any proposed project or any benefit the Drebick development would derive from the new public facilities.[4] Drebick contended any additional traffic added by his construction would make minimal, if any, use of the contemplated improvements because of the remote proximity of his development to those projects and traffic patterns which would substantially exclude their use by new development traffic.
¶ 25 The matter ultimately proceeded to the City's hearing examiner. He factually found:
36. Under Olympia's method, a transportation impact fee does not depend on or vary with the location within the City of the development charged. The fee does not depend on or take into account whether the development charged actually contributes any trips to any of the project groups on which the fee is based.
. . . .
39. Under Olympia's method, the transportation impact fee assessed the Drebick proposal is not proportionate to or reasonably related to the service demands or needs created by the Drebick proposal on each of the individual project groups on which the impact fees are based.
40. The only manner in which the Drebick proposal could be benefited by specific transportation improvements projects it will not use, considered individually, is if those improvements relieve traffic pressure on other links used by the Drebick proposal or if they improved emergency response to the Drebick proposal. No evidence was submitted showing this for any of the individual improvements. Under Olympia's method, the transportation impact fees assessed the Drebick proposal may be used for individual transportation facilities which do not reasonably benefit the Drebick proposal.
Clerk's Papers (CP) at 22-23 (Hr'g Exam'r Findings and Decision). No error has been assigned to these findings. Thus they are verities for the purposes of this appeal. Henderson Homes, Inc. v. City of Bothell, 124 Wash.2d 240, 244, 877 P.2d 176 (1994).
¶ 26 Notwithstanding, the City conditioned Drebick's use and development of his property upon payment of a transportation "impact fee" of more than $132,000. The hearing examiner set aside this fee because of its perceived conflict with chapter 82.02 RCW. The superior court then reversed the hearing examiner. However, the Court of Appeals reversed again, affirmed the hearing examiner, and remanded for further proceedings. In this context, our majority characterizes the issue to be determined:
In calculating the transportation impact fees imposed on the Drebick development, *813 did the city comply with the statutory standards set forth in RCW 82.02.050-.090 for apportioning such fees?
Majority at 804. Although I generally agree with the majority's characterization of the issue as a statutory one, the majority assumes the answer to the real question which is whether we should characterize these fees as "impact fees," the only fees permitted by RCW 82.02.050 through .090.
¶ 27 The relevant statutes are contained in chapter 82.02 RCW. RCW 82.02.020 is a broad prohibition on development fees with certain exceptions:
Except as provided in RCW 82.02.050 through 82.02.090, no county, city, town, or other municipal corporation shall impose any tax, fee, or charge, either direct or indirect, on the construction or reconstruction of . . . commercial buildings . . . .
¶ 28 The $132,000 exaction at issue is obviously within the scope of the aforementioned text since it is imposed on the construction of commercial buildings. Moreover, and just as clearly, it is statutorily barred unless it falls within the statutory exemptions codified in RCW 82.02.050 through .090, all of which relate to "impact fees." As used in the statute, "impact fee" is a term of art defined as:
[A] payment of money imposed upon development as a condition of development approval to pay for public facilities needed to serve new growth and development, and that is reasonably related to the new development that creates additional demand and need for public facilities, that is a proportionate share of the cost of the public facilities, and that is used for facilities that reasonably benefit the new development. . . .
RCW 82.02.090(3). Impact fees are therefore by definition site specific to the new development, unlike taxes which generally raise revenue to fund needed public facilities without regard to the impact on or benefit derived by the new individual development from those facilities. Arborwood Idaho, LLC v. City of Kennewick, 151 Wash.2d 359, 371, 89 P.3d 217 (2004).[5] Keeping this distinction in mind, it is telling that even the City of Olympia claims the fees at issue here "are, in essence, excise taxes on new development generally." Br. of Resp't City of Olympia (Ct.App.29018-9-II) at 12. The problem is "excise taxes on new development generally" cannot meet the definition of "impact fees" because taxes have no necessary relationship to meeting the additional demands of "the new development" nor do they necessarily benefit "the new development" by building facilities to be actually used by the new development.
¶ 29 RCW 82.02.050(3) reinforces the statutory definition with express limitations:
The impact fees:
(a) Shall only be imposed for system improvements that are reasonably related to the new development;

(b) Shall not exceed a proportionate share of the costs of system improvements that are reasonably related to the new development; and
(c) Shall be used for system improvements that will reasonably benefit the new development.

(Emphasis added.) RCW 82.02.060 prescribes the format of a local impact fee ordinance:
Impact fees  Local ordinances  required provisions. The local ordinance by which impact fees are imposed:
(1) Shall include a schedule of impact fees which shall be adopted for each type of development activity . . . . The schedule shall be based upon a formula or other method of calculating such impact fees. In determining proportionate share, the formula or other method of calculating impact fees shall incorporate, among other things, the following:
(a) The cost of public facilities necessitated by new development;
(b) An adjustment to the cost of the public facilities for past or future payments. . . .;

*814 (c) The availability of other means of funding . . . .;
(d) The cost of existing public facilities improvements; and
(e) The methods by which public facilities improvements were financed;
. . . .
(4) Shall allow the county, city, or town imposing the impact fees to adjust the standard impact fee at the time the fee is imposed to consider unusual circumstances in specific cases to ensure that impact fees are imposed fairly;
(5) Shall include a provision for calculating the amount of the fee to be imposed on a particular development that permits consideration of studies and data submitted by the developer to adjust the amount of the fee;
(6) Shall establish one or more reasonable service areas within which it shall calculate and impose impact fees for various land use categories per unit of development. . . .
RCW 82.02.060 (emphasis added).
¶ 30 I agree with the majority that the statutory terms "the new development" and "development activity" and "particular development" relate to a specific proposed project, not projected community development in the aggregate. Majority at 805-06. However, the majority essentially fails to recognize that "Impact fees" as that term is used in RCW 82.02.060 is a term of art specifically defined to be "reasonably related to the new development that creates additional demand and need for public facilities, that is a proportionate share of the cost of the public facilities, and that is used for facilities that reasonably benefit the new development." RCW 82.02.090(3) (emphasis added). Further, the majority ignores RCW 82.02.050, which specifically limits impact fees to (a) system improvements that are reasonably related to the new development, (b) the proportionate share of the cost of those reasonably related system improvements reasonably related to the new development, and (c) system improvements that will reasonably benefit the new development. Rather the fees allowed by the Olympia ordinance are not calculated to specifically cure an impact of "the new development," nor are they for projects which serve the new development. Rather this fee is based on the aggregate of all new development without regard to the cause, consequence, or proportionality as it relates to the specific development at issue here.
¶ 31 In the context of this case the fee imposed on Drebick under the municipal ordinance does not meet the definition of "impact fee" because the projects funded by the fee were not reasonably necessitated by the Drebick development nor would they be necessarily even used by the Drebick development. In the same sense they violate the limitation criteria in RCW 82.02.050(3).
¶ 32 The conclusion that the definition and limitation clauses necessarily apply to the application of any ordinance adopted pursuant to RCW 82.02.060 is buttressed by that statute's reference to "impact fees" and other language which requires site specific consideration by any proper ordinance. Section.060(4) of the statute requires the ordinance to adjust the fee imposed "to consider unusual circumstances in specific cases to ensure that impact fees are imposed fairly." Subsection (5) requires the ordinance to "include a provision for calculating the amount of the fee to be imposed on a particular development that permits consideration of studies and data submitted by the developer to adjust the amount of the fee." And subsection (6) requires the ordinance "[s]hall establish one or more reasonable service areas within which it shall calculate and impose impact fees for various land use categories per unit of development." (Emphasis added.) Each of those provisions specifically contemplate, consistent with the definition of impact fee and the limitations on an impact fee, that the fee be tailored to the actual impact of the specific individual new development notwithstanding the prescriptive manner of calculating the fee. The "reasonable" service areas requirement also highlights the proposition that a proper ordinace would establish service areas which actually serve the proposed development.
¶ 33 As to the last point, the majority seems to confuse the propriety of the service area designation with the quite independent *815 analysis of whether the resulting fee imposed as a precondition to development meets the statutory definition of "impact fee." See majority at 809-10. Just because RCW 82.02.060 provides the statutory authority and outlines the necessary components of a local ordinance to assess "impact fees" within a "reasonable service area[]," does not mean that the resulting fee will actually be an "impact fee" as statutorily defined. That statutory definition includes the requirement that the fee "is reasonably related to the new development that creates additional demand and need for public facilities. . . ." RCW 82.02.090(3). Therefore, by the majority's own statutory analysis the ultimate fee must be calculated on site specific criteria. Whether or not a local ordinance which sets up a fee schedule based upon a formula and a service area actually produces a legitimate "impact fee" must, however, be determined on an as applied basis, to the Drebick building, for example.
¶ 34 The crux of the majority's flaw in reasoning is its assumption, absent statutory or precedential support, that any impact fee ordinance that meets the procedural requirements contained in RCW 82.02.060 per se produces a statutory impact fee tailored to the requirements of proportionality and reasonable causation by, and reasonable benefit to, the specific development project at issue. Majority at 806-07. The majority's conclusion that "the legislature did not require that the funded facilities be directly or specifically related and beneficial to the development seeking approval,"[6] is therefore most problematic. Majority at 807.
¶ 35 The majority assumes this conclusion through an unanalyzed premise: a city or county is permitted to draw a single service area encompassing the whole of that city or county, and therefore all "system improvements" within that service area may be properly charged to any new development consistent with the statute. The majority's conclusory statement, "As permitted in RCW 82.02.060(6), the City `elected to base its fee structure on a single service area co-terminous with its Urban Growth Area,'" majority at 809,[7] is devoid of any discussion of the actual statutory requirement. Indeed, the actual text requires the "local ordinance by which impact fees are imposed . . . (6)[s]hall establish one or more reasonable service areas within which it shall calculate and impose impact fees for various land use categories per unit of development." RCW 82.02.060.
¶ 36 Trimen Development Co. v. King County, 124 Wash.2d 261, 877 P.2d 187 (1994) provides an example of an appropriate ordinance, although its facts arose before the adoption of sections .050 through .090. Under that ordinance, King County imposed park development fees on new construction. Although King County did not conduct a site specific study relating to the Trimen Development, it did calculate the general deficit of parks in the vicinity and the statistical probability of additional park use by each unit of new residential development. The fee was to be expended only in the "park service area" of the new development, an area roughly the size of elementary school boundaries. This methodology, we held, adequately demonstrates the additional need for park space necessitated by each new unit of residential development along with the cost of acquiring it within the specific area to be used by the specific new development. We went on to specifically distinguish the park fee as there calculated from a "tax" which not only lacked legislative authorization but would violate the prohibition of RCW 82.02.020, holding these park fees "are reasonably necessary as a direct result of the proposed development," and are required to mitigate the direct impact of the development. Id. at 270-71, 877 P.2d 187 (quoting RCW 82.02.020). However *816 in the case at bar, as acknowledged by the City of Olympia, the fees at issue are in the nature of taxes to fund generalized public improvements which cost money, not impact fees.
¶ 37 Moreover, it is important to notice that the park fees were sustained in Trimen because they were calculated based upon a "park service area" around the new development only approximately the size of elementary school boundaries, i.e., an area where projected new residents would reasonably recreate in any new park space to be acquired. However, the difference between the park service area approved in Trimen and the citywide service area in the case at bar is a qualitative difference of exponential magnitude. Trimen residents would probably use the new park space whereas Drebick customers would not necessarily use new traffic improvements geographically remote from the Drebick building.
¶ 38 But by the majority's logic, it is "reasonable" for a city which comprises 17 square miles,[8] has almost 80 miles of major roads,[9] and has a population of 43,330 people,[10] to draw a single service area and therefore any resulting fee must be a legitimate "impact fee."
¶ 39 Thus, King County could define its service area as the entire county. A new resident of Vashon Island could be made to pay fees for a system improvement made in Skykomish, even though the Vashon resident may never use a road improvement located 60 milesand one large body of water  away. Or perhaps Stevens County might decide to charge "new development" located outside Northport for a transportation improvement located outside Tumtum, 80 miles distant? Or San Juan County could charge developers on Orcas Island to add a lane to a road on Lopez Island? All this is perfectly sanctioned by the majority opinion, although none of the resulting fees imposed under such ordinances would be reasonably related to the new development nor reasonably benefit the new development and hence neither fits the statutory definition of "impact fee" nor complies with RCW 82.02.050.
¶ 40 Further, the statutory definition of "service area" belies the majority's conclusion that Olympia appropriately drew a single service area for the entire city. RCW 82.02.090(8) defines "[s]ervice area" as "a geographic area defined by a county, city, town, or intergovernmental agreement in which a defined set of public facilities provide service to development within the area." (Emphasis added.) A road which no customer, resident, or visitor to the new development will use hardly provides service to that development.
¶ 41 In addition to its failure to properly follow the "reasonable" requirement in relation to the scope of the service area, which might at least begin to re-moor the statute to its constitutional pilings, the majority fails to apply "reasonably related" or "reasonably benefit" according to the expressed intent of the legislature. The majority does this by accepting unchallenged the assertion that "Every land use benefits in a general sense from a smoothly functioning transportation system with adequate capacity in the jurisdiction in which it is located." Majority at 809 (quoting CP at 22 (Hr'g Exam'r Findings and Decision, Finding 35)). Yes, but that is what taxes are for.
¶ 42 At this level of abstraction every improvement in any city or county is per se reasonably related to new development in that city or county and reasonably benefits new development in that city or county. The "reasonableness" protections of the statute, the definition of impact fees, the statutory limits on impact fees, are thus rendered a nullity. The legislature could have composed *817 a much simpler statute by simply authorizing local governments to impose jurisdiction-wide excise taxes on all new development without regard to the impact that new development might have on public facilities. But it didn't. Yet that's what the majority gives us.
¶ 43 Most fundamentally only "system improvements" can be financed by "impact fees," RCW 82.02.050(3), but such system improvements must still be reasonably related to and reasonably benefit the new development to be "impact fees." RCW 82.02.050(3)(a)-(c).
¶ 44 However this ordinance requires no relation between the new development and the public facility, yet alone a "reasonable" one. But we need not rely on the common understanding of the text. The legislative history, well documented by the Court of Appeals, conclusively demonstrates that the standard of "reasonableness" the legislature intended to be applied with regard to RCW 82.02.050(3)(a)-(c) and 82.02.060(6) is the Nollan/Dolan standard.[11]
¶ 45 The Court of Appeals extensively reviewed the legislative history of House Bill 2929,[12] which was the initial legislation of what became known as the Growth Management Act (chapter 36.70A RCW). For our purposes the most important conclusion to be drawn from the legislative history is the legislature's deliberate use of the identical terms the United States Supreme Court used to describe the "nexus" requirement of the Fifth Amendment: "reasonably related to." City of Olympia v. Drebick, 119 Wash.App. 774, 785, 83 P.3d 443 (2004) (quoting Nollan, 483 U.S. at 838, 107 S.Ct. 3141). As the Court of Appeals noted:
When the 1990 legislature was considering the GMA, it undoubtedly knew about Nollan, which was then the only case in which the United States Supreme Court had addressed the propriety of conditioning a building permit on the exaction of private property without compensation. Thus, we infer that the 1990 legislature did not use Nollan's phrase ("reasonably related to") by coincidence; instead, we think, the legislature used the same phrase with intent to adopt Nollan's meaning and assure the new statute's constitutionality. Nollan had used the phrase ("reasonably related to") to mean a link or "nexus" between the public problem to be alleviated and the individualized impacts of the permittee's specific project, and we conclude that the 1990 legislature used the same phrase in the same way.
Id.[13]
¶ 46 Nollan, of course, required a nexus between the exaction[14] and the individualized *818 impacts of the specific project. Nollan, 483 U.S. at 837, 107 S.Ct. 3141. Dolan extended Nollan by additionally requiring that the exaction be roughly proportional to the impacts of the development. Dolan, 512 U.S. at 391, 114 S.Ct. 2309. But even if the legislature had only Nollan's definition of "reasonably related" in mind when it used the exact same phrase, our majority defeats the Nollan and the Washington State Legislature's definition.
¶ 47 The citywide averaged fee imposed in this case by definition does not consider the individual impacts of Drebick's development and therefore fails both the Nollan test and the requirement that the impact fee be "reasonably related" to the development under RCW 82.02.050(3).[15]
¶ 48 Finally, the definition of "[p]roportionate share" in RCW 82.02.090(5) supports the conclusion that the legislature intended the Nollan definition of "reasonably related" (and also tracks Dolan). RCW 82.02.050(3)(b) provides that "impact fees . . . [s]hall not exceed a proportionate share of the costs of system improvements that are reasonably related to the new development." RCW 82.02.090(5) defines "[p]roportionate share" as "that portion of the cost of public facility improvements that are reasonably related to the service demands and needs of new development." This definition clearly defines the amount of impact fees that can be charged in relation to the specific proposed development. The "service demands" of the new development aren't for a "functioning transportation system," an abstract notion not susceptible to definition in any event, but for certain capacities on specific roadways that will be utilized by the development's customers and employees.
¶ 49 This court's duty is to construe statutes constitutionally if such is possible. High Tide Seafoods v. State, 106 Wash.2d 695, 698, 725 P.2d 411 (1986). Given that the legislatively intended definition of "reasonably related to" in RCW 82.02.050 complies with  and indeed is identical to  the requirements of Nollan and Dolan, a constitutional construction is certainly available. Indeed, we have upheld impact fees while *819 specifically noting Dolan's requirements where a reasonable service area was drawn under an ordinance that required the infrastructure to actually serve the new development. See Trimen Dev. Co. v. King County, 124 Wash.2d 261, 274, 877 P.2d 187 (1994).[16]
¶ 50 The literal text of chapter 82.02 RCW requires an impact fee imposed under RCW 82.02.050-.090 be "reasonably related to" and "reasonably benefit" the new development and that local governments define "reasonable" service areas. The legislature used Nollan's exact language for a reason, and the requirement that there at least be a nexus between the impact of the development and the fee imposed thus defines the "reasonableness" of such fees. But here there is no demonstrated connection between this fee and any impact of this development; just the opposite. Thus I would hold that Olympia's citywide averaged fee as applied here violates RCW 82.02.020.
I dissent.
J.M. JOHNSON, J., concurs.
CHAMBERS, J., concurs in result only.
NOTES
[1] Relying on New Castle Investments v. City of LaCenter, 98 Wash.App. 224, 989 P.2d 569 (1999), review denied, 140 Wash.2d 1019, 5 P.3d 9 (2000), the hearing examiner determined that the "impact fees must be deemed taxes," but he concluded that, even so, they "must still meet the relationship, proportionality and benefit requirements of RCW 82.02.050 et seq." Clerk's Papers (CP) at 42. Similarly, the Court of Appeals described "the [tax-fee] distinction" as "immaterial": "Given that RCW 82.02.020 bars either a tax or a fee `[e]xcept as provided in RCW 82.02.050 through 82.02.090,' the question here is not whether the City assessed a tax or fee, but whether the City complied with RCW 82.02.050 through RCW 82.02.090." Drebick, 119 Wash.App. at 778-79, 83 P.3d 443 (citing New Castle, 98 Wash.App. at 234, 236, 989 P.2d 569 (concluding that impact fees "resemble taxes" but declining to "hold that these fees are taxes")). We agree that merely labeling the GMA impact fees either taxes or regulatory fees will not be dispositive here. Our task is to interpret the relational standard prescribed in RCW 82.02.050(3) and to determine whether the City complied with that standard.
[2] The term "[s]ystem improvements" denotes those "public facilities that are included in the capital facilities plan and are designed to provide service to service areas within the community at large, in contrast to project improvements." RCW 82.02.090(9) (emphasis added); see RCW 82.02.090(6) (defining "[p]roject improvements" as "site improvements . . . planned and designed to provide service for a particular development project"); RCW 82.02.090(7) (defining "[p]ublic facilities" as, generally, roads, parks, schools, and fire stations).
[3] In contrast to this analysis, the Court of Appeals decision rests on the unpersuasive view that RCW 82.02.050(3) is "ambiguous in at least two ways." 119 Wash.App. at 780, 83 P.3d 443. The Court of Appeals contended that the phrase "the new development" referred ambiguously to all new developments or to the particular development seeking approval. Id. The court necessarily found a second instance of ambiguity in whether the impact fees had to be "reasonably related to" "the cumulative impacts of all new development activity" or to "the individualized impacts of the permittee's specific project." Id. Only by declaring RCW 82.02.050(3) ambiguous was the court able to embark sua sponte on a lengthy examination of legislative history, id. at 781-86, 83 P.3d 443, and to conclude with an application of two canons of statutory construction. Id. at 786-90, 83 P.3d 443; see Campbell & Gwinn, 146 Wash.2d at 11-12, 43 P.3d 4 (noting that recourse to legislative history is appropriate only where intended meaning is indiscernible from plain language of provision and related provisions and statutes).
[4] For example, the dissent relies on Ehrlich v. City of Culver City, 12 Cal.4th 854, 50 Cal.Rptr.2d 242, 911 P.2d 429, 444, cert. denied, 519 U.S. 929, 117 S.Ct. 299, 136 L.Ed.2d 218 (1996). There, the owner of a tennis and fitness club sought approval to replace the facility with a condominium development. To address the loss of the recreational space, the city, in response to the developer's offer to build four new tennis courts, conditioned project approval on a payment of $280,000 in lieu of the four courts. The California State Supreme Court concluded that the Nollan-Dolan standard applicable to land exactions for direct impacts should also apply to fees imposed in lieu of such exactions for direct impacts. Id. 50 Cal.Rptr.2d 242, 911 P.2d at 447. Significantly, the Ehrlich court observed that "it is not at all clear that the rationale (and the heightened standard of scrutiny) of Nollan and Dolan applies to cases in which the exaction takes the form of a generally applicable development fee or assessmentcases in which the courts have deferred to legislative and political processes to formulate `public program[s] adjusting the benefits and burdens of economic life to promote the common good.'" Id. (quoting Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)).
[5] Notably, the hearing examiner did not import the Nollan-Dolan standard into his analysis of the statutory standards. CP at 42.
[6] "Independent fee calculations have been granted by the City in the past where it was shown that the development in question did not generate projected peak hour traffic flows or that the traffic, if generated, primarily utilized transportation facilities in other cities. Cited examples were an apartment complex for the aged, a boat repair workshop, and a hotel on the edge of the City." CP at 7.
[7] See supra note 2 (distinguishing "project improvements" and "system improvements"). The dissent's reliance on Trimen Development Co. v. King County, 124 Wash.2d 261, 877 P.2d 187 (1994), underscores the dissent's mistaken belief that GMA impact fees are indistinguishable from the direct mitigation fees of RCW 82.02.020. Dissent at 815-16. Even though the fees at issue in Trimen predated the adoption of GMA impact fees and aimed to mitigate the direct impact of a development project, the dissent nevertheless claims that King County's designation of a "park service area" immediately surrounding the new development "provides an example of an appropriate ordinance" for Olympia. Id. at 816.
[1] Br. of Resp't City of Olympia (Ct.App.29018-9-II) at 12.
[2] Id. at 13.
[3] Absent express authorization, municipalities may not impose a tax (Hillis Homes, Inc. v. Snohomish County, 97 Wash.2d 804, 809, 650 P.2d 193 (1982), Wash. Const. art. VII, § 2), and municipalities may not tax contrary to the general laws (R/L Assoc., Inc. v. City of Seattle, 113 Wash.2d 402, 780 P.2d 838 (1989) and San Telmo Assocs. v. City of Seattle, 108 Wash.2d 20, 24, 735 P.2d 673 (1987), Wash. Const. art. VII, § 5). See also Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), discussion infra pp. 817-18.
[4] The City projected the cost of all transportation improvement projects inside the urban growth area (UGA) needed to provide capacity for all new growth over a six year period. The City then projected the total number of new afternoon peak hour trips with one end inside the UGA, and it divided the cost by the number of trips. This per-trip cost was then applied to new development by multiplying the derived figure by the number of trips the new development would generate, regardless of whether any of those trips would actually use any of the new transportation improvement projects. Clerk's Papers (CP) at 21 (Findings and Decision of the Hr'g Exam'r of the City of Olympia, Finding 32) (Nov. 2, 2000) (Hr'g Exam'r Findings and Decision).
[5] The majority asserts "merely labeling the GMA impact fees either taxes or regulatory fees will not be dispositive here." Majority at 804 n.1. I disagree because taxes by their nature cannot be "impact fees" as statutorily defined, and only impact fees are excepted from the broad statutory prohibition.
[6] "Directly" and "specifically" are not statutory terms, nor are they derived from the relevant constitutional cases. Such terms are easily confused and misunderstood when divorced from the statutory and constitutional context. As noted, supra, the requirement of a nexus and rough proportionality  which define the "reasonable" relationship under the statute  dictate a certain level of connection between the impact fee and the impacts of the development. Whatever that level of connection, whether directly, specifically, reasonably, or roughly related, it is not present in this case.
[7] The majority repeats its conclusion at page 808 without further analysis.
[8] See U.S. Census Bureau, State and County Quickfacts,

http://quick facts.census.gov /qfd/states/53/ 5351300.html (last visited Jan. 13, 2006).
[9] Including interstates, arterials, and collectors, but not even including smaller roads.
[10] See Municipal Research & Servs. Ctr. of Wash.,

http://www.mrsc.org/cityprofiles/cityprofile.aspx?id=167 (last visited Jan 13, 2006). Olympia is the 19th largest city in Washington State. Id.,
http://www.mrsc.org/subjects/finance/ctytax04p.aspx.
[11] Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); Dolan v. City of Tigard, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994).
[12] See City of Olympia v. Drebick, 119 Wash.App. 774, 781-85, 83 P.3d 443 (2004).
[13] Further, the legislature is presumed to be familiar with judicial decisions on the subject on which it is legislating. Daly v. Chapman, 85 Wash.2d 780, 782, 539 P.2d 831 (1975).
[14] The majority claims "nor does the dissent mention that neither the United States Supreme Court nor this court has determined that the tests applied in Nollan and Dolan to evaluate land exactions must be extended to the consideration of fees imposed to mitigate the direct impacts of a new development, much less to the consideration of more general growth impact fees imposed pursuant to statutorily authorized local ordinances." Majority at 808-09. Quite correct, because the United States Supreme Court has vacated statutorily imposed monetary impact fees for further consideration in light of Dolan. Ehrlich v. City of Culver City, 512 U.S. 1231, 114 S.Ct. 2731, 129 L.Ed.2d 854 (1994). On remand the California Supreme Court "reject[ed] the proposition that Nollan and Dolan are entirely without application to monetary exactions." Ehrlich v. City of Culver City, 12 Cal.4th 854, 876, 50 Cal.Rptr.2d 242, 911 P.2d 429, 444 (1996). See also Benchmark Land Co. v. City of Battle Ground, 103 Wash.App. 721, 14 P.3d 172 (2000), aff'd on other grounds by Benchmark Land Co. v. City of Battle Ground, 146 Wash.2d 685, 49 P.3d 860 (2002) (holding that Dolan proportionality test applies to impact fees); Sandra M. Stevenson, ANTIEAU ON LOCAL GOVERNMENT LAW 4-56, at § 56.05 (2d ed.2005); ZONING AND LAND USE CONTROLS, PART II, MODERN ZONING TRENDS, CH. 9: EXACTIONS, IMPACT FEES AND OTHER LAND DEVELOPMENT CONDITIONS, 2-9 ZONING AND LAND USE CONTROLS § 9.02, "Nexus, Proportionality, and Takings: Nollan, Dolan and Progeny, [4] Applicability of Nollan and Dolan to All Land Development Conditions" (Matthew Bender 2005) and id., § 52A.04 at 8-52A, "Established and Emerging Rules in Takings Cases, [2] Categorical Rules in Exactions Cases, [c] Combined Effect of the `Rational Nexus' and `Rough Proportionality' Tests" (citing Benchmark Land Co., 94 Wash.App. 537, 972 P.2d 944, concluding that Nollan and Dolan tests apply to fees); City of Portsmouth v. Schlesinger, 57 F.3d 12, 16-17 (1st Cir.1995) (impact fee unlawful exaction); Consumers Union of U.S., Inc. v. State, 5 N.Y.3d 327, 354-355, 806 N.Y.S.2d 99, 840 N.E.2d 68 (2005) (fee is exaction to which Nollan and Dolan apply); Home Builders Ass'n v. City of Beavercreek, 89 Ohio St.3d 121, 128, 729 N.E.2d 349, 356 (2000) (using Nollan and Dolan tests when "evaluating the constitutionality of an impact fee ordinance"); Town of Flower Mound v. Stafford Estates, L.P., 135 S.W.3d 620, 639-40 (Tex.2004) (applying Nollan and Dolan to impact fees); J. David Breemer, The Evolution of the "Essential Nexus": How State and Federal Courts Have Applied Nollan and Dolan and Where They Should Go From Here, 59 WASH. & LEE L. REV. 373, 390 (2002) (noting "growing recognition that the logic of Nollan and Dolan" applies to fees).
[15] The majority posits a distinction between a "`generally applicable development fee'" and a site specific fee. Majority at 808 n.4 (quoting Ehrlich v. City of Culver City, 12 Cal.4th 854, 881, 50 Cal.Rptr.2d 242, 911 P.2d 429, 444, cert. denied, 519 U.S. 929, 117 S.Ct. 299, 136 L.Ed.2d 218 (1996)). I think the majority's misimpression might be cured if it placed the quoted material in proper context:

One of the central promises of the takings clause is that truly public burdens will be publicly borne. Where the regulatory land-use power of local government is deployed against individual property owners through the use of conditional permit exactions, the Nollan test helps to secure that promise by assuring that the monopoly power over development permits is not illegitimately exploited by imposing conditions that lack any logical affinity to the public impact of a particular land use. The essential nexus test is, in short, a "meansends" equation, intended to limit the government's bargaining mobility in imposing permit conditions on individual property owners  whether they consist of possessory dedications or the exaction of cash payments  that, because they appear to lack any evident connection to the public impact of the proposed land use, may conceal an illegitimate demand  may, in other words, amount to "`out and out . . . extortion.'" (Nollan, supra, 483 U.S. at p. 837 [107 S.Ct. at p. 3149, 97 L.Ed.2d at p. 689].).
Ehrlich, 12 Cal.4th at 876, 50 Cal.Rptr.2d 242, 911 P.2d 429. Drebick was indeed subjected to a "conditional permit exaction[]" which also "lack[ed] any logical affinity to the public impact of [his] particular land use." Id. The fact that the fee was calculated pursuant to a formula the application of which "lack[s] any logical affinity to the public impact of a particular land use" hardly cures the constitutional problem which would exist if the same exaction were imposed in the absence of a formulaic ordinance.
[16] The majority's citation to New Castle Investments v. City of LaCenter, 98 Wash.App. 224, 989 P.2d 569 (1999), and Wellington River Hollow, L.L.C. v. King County, 121 Wash.App. 224, 54 P.3d 213 (2002) are unavailing. New Castle was not a case about the validity of impact fees but about whether the impact fees are land use control ordinances for purposes of our state vesting statute. Further, the Court of Appeals specifically noted that Nollan/Dolan's requirement of rough proportionality is not necessarily a direct relationship (which would comport with the "exacting correspondence" rejected in Dolan, 512 U.S. at 389-90, 114 S.Ct. 2309), but there still must be a "roughly proportional" relationship  a relationship the Dolan court derived specifically from the "reasonable relationship" test adopted by numerous other state courts. See Dolan, 512 U.S. at 391, 114 S.Ct. 2309. Wellington upheld a school impact fee imposed based on projected student enrollment in the school district from the new development. This was at least some link between the impact  more students  and the solution  school improvements. But here the City of Olympia did not demonstrate any link between the "impact" of the new development and the capital facilities to be built. In Wellington some of the improvements were the addition of classrooms at a high school near the development. However, to the extent that Wellington held that impact fees could be imposed where no use of the facilities by students from the new development would occur, the Court of Appeals opinion in Wellington should not be followed.