IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 5, 2019 Session

## HOME BUILDERS ASSOCIATION OF MIDDLE TENNESSEE ET AL. v. WILLIAMSON COUNTY, TENNESSEE ET AL.

**Appeal from the Chancery Court for Williamson County**
**No. 46451        James G. Martin, III, Chancellor**

_____

### No. M2019-00698-COA-R3-CV

_____

An organization of developers brought suit against Williamson County seeking a declaratory judgment that an impact fee imposed on new developments to fund improvements to schools throughout the county exceeded the authority granted to the county by the legislature, or alternatively, that Tenn. Code Ann. § 13-3-413(b) exempted the organization's members from paying the impact fee because their property rights vested prior to adoption of the impact fee. The trial court granted summary judgment to the county, concluding that the impact fee did not exceed the authority granted to the county and that Tenn. Code Ann. § 13-3-413(b) did not apply because the impact fee did not constitute a development standard. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which RICHARD H. DINKINS and W. NEAL MCBRAYER, JJ., joined.

John P. Williams and Thomas V. White, Nashville, Tennessee, for the appellants, Home Builders Association of Middle Tennessee, Drees Premier Homes, Inc., Ole South Properties, Inc., Regent Homes, LLC, Aspen Construction, LLC, Barlow Builders, LLC, The Jones Company of Tennessee, LLC, Ridgemont Homes, LLC, and Gateway Mosby Cool Springs, LLC.

Jeffrey D. Moseley and Jason A. Hughes, Franklin, Tennessee, for the appellees, Williamson County, Tennessee, Mayor of Williamson County, and Williamson County Board of Commissioners.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

Significant growth in the construction of residential housing caused severe financial strain on Williamson County ("the County") to provide services such as water, roads, parks, and schools. In 1987, to alleviate some of this strain, the General Assembly passed a private act known as the "Williamson County Construction Impact Fee Act," 1987 Tenn. Priv. Acts Ch. 120 ("the Private Act"). The preamble to the Private Act provides that the County is authorized to impose an impact fee on all new residential construction within Williamson County with the qualification that the County earmark the fees collected "for the funding of such services necessitated by the new development." Notably, section 3 of the Private Act states that the intent and purpose of the Private Act is to:

> establish a regulatory procedure or system to collect fees from the developer of any new land development activity so as to require the developer to share in the burdens of growth by paying his pro rata share for the reasonably anticipated expansion cost of public improvements generated by the new land development activity.

In the years following passage of the Private Act, the County continued to experience significant residential growth, which caused increased enrollment in the County's schools. When the new growth strained the capacity of the County's schools and existing revenue sources could not sufficiently provide for capital improvements to the schools to accommodate the increased enrollment, the County exercised its authority under the Private Act on November 14, 2016, and adopted Resolution No. 11-16-6. The resolution imposes an impact fee on all new residential development in Williamson County "for the purpose of mitigating the impact the new residential development has on the County's need to build or expand education facilities." Williamson County, Resolution No. 11-16-6, § 2. Section 6 of Resolution No. 11-16-6 created two service areas: Williamson County Schools ("WCS") and the Franklin Special School District ("FSSD"). FSSD students attend FSSD schools from kindergarten through eighth grade and then attend WCS high schools. The impact fees collected are only used to fund capital improvements to WCS schools and must be spent in accordance with the "Capital Improvement Program," which is a proposed schedule of school improvement projects in the County listed in order of priority. *Id.* §§ 3.3, 6. Therefore, the resolution allows the County to spend the impact fees collected to fund school improvement projects throughout the County, not just on the schools that serve the particular development paying the fee.

Resolution No. 11-16-6, section 7.1 requires that the impact fee be calculated and collected at the time a developer applies for a building permit. Thus, the County had to

determine the amount of the impact fee to be imposed. The County hired a consulting firm, TischlerBise, to assist in establishing a method for calculating the impact fee. After conducting a study of the County's projected growth and the cost of educational facilities that would be needed to serve the new growth, TischlerBise determined that the size of a new home correlated to the number of school-age children who would live there. TischlerBise then developed a schedule of fees to be assessed on a pro rata basis based on the square footage of the new home, the number of school-age children that would be expected to live there, and the service area where the home would be located. The County adopted TischlerBise's proposed impact fee schedule on November 14, 2016, with Resolution No. 11-16-7. At the time the County adopted Resolution Nos. 11-16-6 and 11-16-7, there were developers whose preliminary development plans had already been approved. Neither resolution contained a provision exempting these developers from paying the impact fee when they applied for a building permit following the adoption of the impact fee.

On July 28, 2017, Home Builders Association of Middle Tennessee ("Home Builders Association"), an organization of developers who construct homes in Williamson County, filed a declaratory judgment action against the County, the County's mayor, and the County's board of commissioners. In the complaint, Home Builders Association contended that the impact fee, as adopted by the County, exceeded the authority granted by the Private Act because the resolutions do not require that the funds collected be used to fund school improvements that will directly benefit the development paying the fee. They further contended that the impact fee, as adopted by the County, violated the Vested Property Rights Act, as codified at Tenn. Code Ann. § 13-3-413(b), because it failed to exempt developments for which the County had approved development plans prior to adopting the impact fee. Finally, Home Builders Association requested that the impact fee be declared invalid.

The parties filed cross-motions for summary judgment. After hearing argument from both sides, the trial court concluded that the "[r]esolutions adopted by [the County] are consistent with the General Assembly's intent concerning the way Impact Fees are to be implemented under [the Private Act]." The trial court found that the Vested Property Rights Act did not apply to the impact fee adopted by the County because the development standards referred to in that act pertain "to matters relating to the physical aspects of development, not the payment of fees" and that the Private Act "does not affect a developer's rights in regards to the physical use of the land." On March 29, 2019, the trial court entered a memorandum and order granting the County's motion for summary judgment. The Home Builders Association appealed.

STANDARD OF REVIEW

We review a trial court's summary judgment determination de novo, with no presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d

235, 250 (Tenn. 2015). Therefore, "we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Id.* Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." TENN. R. CIV. P. 56.04. In this case, the relevant facts are not disputed. The only question we must answer is whether the County was entitled to summary judgment as a matter of law. To answer this question, we must interpret the Private Act and the Vested Property Rights Act.

Statutory interpretation is a question of law that we review de novo with no presumption of correctness. *Home Builders Ass'n of Middle Tenn. v. Williamson Cnty.*, 304 S.W.3d 812, 816 (Tenn. 2010). When construing a statute, we do so in accordance with well-settled principles that our Supreme Court has articulated as follows:

> The leading rule governing our construction of any statute is to ascertain and give effect to the legislature's intent. To that end, we start with an examination of the statute's language, presuming that the legislature intended that each word be given full effect. When the import of a statute is unambiguous, we discern legislative intent "from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning."

*Myers v. AMISUB (SFH), Inc.*, 382 S.W.3d 300, 308 (Tenn. 2012) (citations omitted). If the statutory language is ambiguous, however, "we construe the statute's meaning by examining 'the broader statutory scheme, the history of the legislation, or other sources.'" *Home Builders Ass'n*, 304 S.W.3d at 817 (quoting *State v. Sherman*, 266 S.W.3d 395, 401 (Tenn. 2008)). Statutory language is ambiguous if it "'is capable of conveying more than one meaning.'" *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 309 (Tenn. 2008) (quoting *LeTellier v. LeTellier*, 40 S.W.3d 490, 498 (Tenn. 2001)).

ANALYSIS

I. Validity of the County's Impact Fee.

The first issue presented by Home Builders Association is whether the impact fee, as implemented by the County, exceeds the authority granted by the General Assembly in the Private Act. Home Builders Association argues that the County's implementation of the impact fee exceeded the authority granted by the Private Act because Resolution Nos. 11-16-6 and 11-16-7 do not require the County to spend the funds collected from the impact fee solely for improvements at the specific schools that serve the residents of the new developments paying the fee. Like the County, an increasing number of local

governments across the country are relying on impact fees as a source of revenue to provide expanded public facilities, such as schools, that are necessitated by new development. Tyson Smith and Julian Conrad Juergensmeyer, *Development Impact Fees 2006: A Year in Review*, 59 PLANNING & ENVTL. LAW 3 (Feb. 2007). The increased reliance on impact fees has led to an increase in legal challenges to impact fee laws in various jurisdictions. *Id.* This is the first time a Tennessee appellate court has been asked to address the validity of an impact fee. Thus, we must look to other jurisdictions for guidance on this issue.

A. Authority to Impose an Impact Fee.

When determining the validity of an impact fee, many courts begin by determining whether a statute or constitutional provision authorized the local government to impose the impact fee. *See Mayor & Bd. of Aldermen, City of Ocean Springs v. Homebuilders Ass'n of Miss., Inc.*, 932 So. 2d 44, 50-51 (Miss. 2006); *Durham Land Owners Ass'n v. Cnty. of Durham*, 630 S.E.2d 200, 203-06 (N.C. Ct. App. 2006); *Idaho Bldg. Contractors Ass'n v. City of Coeur d'Alene*, 890 P.2d 326, 328 (Idaho 1995); *N.J. Builders Ass'n v. Mayor Twp. Comm. of Bernards Twp., Somerset Cnty.*, 528 A.2d 555, 560 (N.J. 1987); 15 McQuillin THE LAW OF MUNICIPAL CORPORATIONS § 39.5 (3d ed. 2019). Courts have generally held that impact fees are invalid in situations where a local government imposes an impact fee without statutory or constitutional authority to do so. *See City of Ocean Springs*, 932 So. 2d at 53; *Durham Land Owners Ass'n*, 630 S.E.2d at 206, 208; *N.J. Builders Ass'n*, 528 A.2d at 562.

In the present case, the preamble to the Private Act states that the County is authorized "to levy impact fees upon new developments" so as "to provide that new development[s] contribute [their] fair share of the cost of providing public improvements and services." Section 2 of the Private Act defines "capital or public improvements" as:

> [T]he construction, reconstruction, building, replacement, extension, enlargement, or repair of any street, road, alley, sidewalk, gutter, and other similar improvements; schools; parks and playgrounds; waterworks, water distribution systems, sewers, sewerage, storm water or drainage system authorized by the governing body; and includes any one (1) or more or any combination of these public improvements.

1987 TENN. PRIV. ACT Ch. 120. As evidenced by the above language, the construction or enlargement of schools constitutes a "public improvement." The language of the Private Act, therefore, clearly and unambiguously authorizes the County to impose an impact fee on new developments so that the new developments contribute their fair share of the cost incurred by the County to construct or enlarge schools to accommodate the increased enrollment generated by the new developments.

B.  Tax vs. Fee.

Once it is determined that a local government has statutory or constitutional authority to impose an impact fee, courts then analyze whether the impact fee constitutes a tax or a fee.  *See* 15 McQuillin THE LAW OF MUNICIPAL CORPORATIONS § 39.5 (3d ed. 2007).  The power to tax resides in the General Assembly, but the General Assembly may "delegate to counties and incorporated towns the power to tax for county or corporation purposes."  *Williams v. Taxing Dist.*, 84 Tenn. 531, 536 (1886).  Generally, impact fees are deemed invalid if they are determined to be unauthorized taxes.  *See City of Ocean Springs*, 932 So. 2d at 59; *Idaho Bldg. Contractors Ass'n*, 890 P.2d at 331; *Broward Cnty. v. Janis Dev., Corp.*, 311 So.2d 371, 375 (Fla. Dist. Ct. App. 1975); *see also* Smith and Juergensmeyer, PLANNING & ENVTL. LAW at 3.  Thus, in the present case, if the impact fee assessed by the County exceeded the authority granted by the General Assembly in the Private Act, it would constitute an unauthorized tax.  In order to address this issue, we must briefly discuss the difference between a tax and a fee.

Whether a charge constitutes a tax or a fee depends on its purpose.  *City of Tullahoma v. Bedford Cnty.*, 938 S.W.2d 408, 412 (Tenn. 1997).  A tax is a method for generating revenue and is imposed "for the purpose of paying the government's general debts and liabilities."  *Id.*  Generally, legislatures impose taxes on most, or all, of their citizens.  *San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of Puerto Rico*, 967 F.2d 683, 685 (1st Cir. 1992).  The funds collected from a tax are placed in "a general fund, and spent for the benefit of the entire community."  *Id.*; *see also City of Tullahoma*, 938 S.W.2d at 412.  A fee, on the other hand, "is imposed for the purpose of regulating a specific activity or defraying the cost of providing a service or benefit to the party paying the fee."  *City of Tullahoma*, 938 S.W.2d at 412.  Thus, the revenue collected from a fee may be spent to provide a service or benefit to those paying the fee but not to pay the general debts or liabilities incurred by the government.  *See id.*

No party points the court to any Tennessee legal authority governing the use of impact fees in this circumstance.  Courts have developed several tests to determine whether an impact fee is an authorized fee or an unauthorized tax.  Some states apply the reasonable relationship test.  Under this test, local governments are afforded considerable discretion in imposing impact fees and need only demonstrate that there is a reasonable relationship between the fee and the cost of the proposed development.  *See Associated Home Builders of Greater E. Bay, Inc. v. City of Walnut Creek*, 484 P.2d 606, 616 (Cal. 1971); *Cal. Bldg. Indus. Ass'n v. San Joaquin Valley Air Pollution Control Dist.*, 178 Cal. App. 4th 120, 134-35 (Cal. Ct. App. 2009).

Other states apply a more stringent test known as the specifically and uniquely attributable test. Under this test, an impact fee constitutes an authorized fee if a local government shows that the impact fee "'is directly proportional to the specifically created need.'" *N. Ill. Home Builders Ass'n, Inc. v. Cnty. of Du Page*, 649 N.E.2d 384, 389 (Ill. 1995) (quoting *Dolan v. City of Tigard*, 512 U.S. 374, 389-90 (1994)). Thus, this test provides that a valid impact fee is one that requires a developer to assume the costs for only the improvements "'which are required by [his] activity.'" *Id.* at 390 (quoting *Pioneer Trust & Sav. Bank v. Village of Mt. Prospect*, 176 N.E.2d 799, 801 (Ill. 1961)). An impact fee requiring a developer to assume the costs "for improvements made necessary by 'the total activity of the community,' would be forbidden." *Id.* (quoting *Pioneer Trust*, 176 N.E.2d at 802). This test provides real estate developers with the maximum level of protection, but it allows local governments little discretion to impose impact fees. *Home Builders Ass'n of Dayton & the Miami Valley v. City of Beavercreek*, 729 N.E.2d 349, 356 (Ohio 2000).

Finally, some states apply the dual rational nexus test. *City of Beavercreek*, 729 N.E.2d at 356; *St. Johns Cnty. v. Ne. Fla. Builders Ass'n, Inc.*, 583 So. 2d 635, 637 (Fla. 1991). Under this test, a local government must prove: (1) that there is "a reasonable connection, or rational nexus, between the need for additional capital facilities and the growth in population generated" by the new development and (2) that there is "a reasonable connection, or rational nexus, between the expenditures of the funds collected and the benefits accruing to" the new development. *Hollywood, Inc. v. Broward Cnty.*, 431 So. 2d 606, 611-12 (Fla. Dist. Ct. App. 1983). If the impact fee satisfies both prongs of the test, it constitutes an authorized fee. *See St. Johns Cnty.*, 583 So. 2d at 637; *Hollywood, Inc.,* 431 So. 2d at 611-13; *City of Beavercreek*, 729 N.E.2d at 356-58. Of these tests, the dual rational nexus test is the only one that balances both the interests of real estate developers and the interests of local governments. Thus, we adopt the dual rational nexus test for determining the validity of an impact fee.

C. Application of the Dual Rational Nexus Test.

Under the first prong of the dual rational nexus test, the County must prove that there is a reasonable connection between the need for additional or expanded schools and the growth in population accompanying new development. *See City of Beavercreek*, 729 N.E.2d at 356. To determine whether an impact fee satisfies this prong, courts focus on the methodology used for calculating the fee. *See id.*; *St. Johns Cnty.*, 583 So. 2d at 638-39.

The County attached to its motion for summary judgment the deposition testimony of Carson Bise, the owner of TischlerBise. Mr. Bise conducted a study regarding the County's projected growth and the cost of providing schools to serve that new growth. Based on this study, he determined that the square-footage of a home corresponded to the number of school-age children expected to live in that home. Mr. Bise then created a fee

schedule, which the County adopted, based on the projected square footage of a new home and the expected cost to the County to provide schools to serve children that would live in that new home. For instance, Mr. Bise determined that, per 1,400 square-foot home, there would be 0.259 children in grades kindergarten through eight and 0.117 children in grades nine through twelve. According to Mr. Bise, for a 1,400 square-foot home, it would cost the County $3,404 to provide schools for children in grades kindergarten through eight and $1,914 to provide children with high schools. Therefore, if a new 1,400 square-foot home were to be located in the WCS service area, it would be assessed an impact fee of $5,317, the combined expected cost of providing schools for children in kindergarten through twelfth grade. If a new 1,400 square-foot home was located within the FSSD, however, it would only be assessed an impact fee of $1,914, the expected cost of providing high schools to serve the development. The evidence presented by the County regarding its methodology for calculating the impact fee shows there is a reasonable connection between the need for school capital improvements and the growth in population due to new development. Home Builders Association presented no evidence challenging the County's methodology for calculating the impact fee. We conclude, therefore, that the impact fee satisfies the first prong of the dual rational nexus test.

Determining whether the impact fee satisfies the second prong of the test is more difficult. For this prong, the County must show that a development is paying its proportionate share of the costs necessary to expand or construct schools to serve the development by demonstrating that a reasonable connection exists between the expenditure of funds collected by the impact fee and the benefit accruing to the development paying the impact fee. *See City of Olympia v. Drebick*, 126 P.3d 802, 806-07 (Wash. 2006); *City of Beavercreek*, 729 N.E.2d at 357; *Hollywood, Inc.*, 431 So. 2d at 612.

Sections 2 and 11.1 of Resolution No. 11-16-6 provide that the impact fee shall be calculated and collected from all new residential development "for the purpose of mitigating the impact the new residential development has on the County's need to build or expand education facilities," and that the funds collected "shall be expended only in conformance with the Capital Improvement Program." Thus, the County may assess the impact fee on a countywide basis and spend the money collected on school construction projects throughout the County based on the project's assigned priority in the Capital Improvement Program. For instance, the impact fee funds collected from a developer for a new home in Spring Hill could be used to fund capital improvements to a school in Brentwood rather than to a school specifically serving the development in Spring Hill.

Home Builders Association argues that implementing the impact fee in such a way means that no reasonable connection exists between the expenditure of funds and the benefit received by the development paying the fee. Home Builders Association contends that, for there to be a reasonable connection, the funds collected from the impact

fee must be spent on capital improvements to schools that would provide a direct benefit to the particular new development that paid the fee. According to Home Builders Association, the County could achieve this result by imposing the impact fee one development at a time, rather than on a countywide basis, after determining the specific costs for capital improvements to schools caused by that particular new development. The County responds that the impact fee is assessed to address the strain on the capacity of all the County's schools. Thus, the County asserts, capital improvements to a school anywhere in the district increases the overall capacity of the system, which benefits all new developments paying the impact fee.

To support its argument, Home Builders Association relies on section 3 of the Private Act which authorizes the County to assess an impact fee against "*the* developer of any new development activity so as to require *the* developer to share in the burdens of growth by paying his pro rata share for the reasonably anticipated expansion cost of public improvements generated by *the* new land development activity." (Emphasis added). Home Builders Association argues that the General Assembly's use of "the" clearly and unambiguously refers to the particular new development paying the impact fee. We agree. Other sections of the Private Act reinforce this interpretation. For instance, section 5 of the Private Act provides that the County "shall establish an impact fee formula that requires *the developer* to pay an impact fee that does not exceed a pro rata share of the reasonably anticipated cost for the public improvements *created by the new land development activity*." (Emphasis added). Moreover, section 6 of the Private Act requires the County to "provide a schedule and method for the payment of the fees *in a manner appropriate to the particular circumstances of the proposed new development*." (Emphasis added). We conclude that the Private Act clearly and unambiguously provides that the impact fees imposed by the County are to be a pro rata share of the costs of public improvements (that is schools, sewers, roads, parks) that are reasonably anticipated to be created by the particular new development paying the impact fee.

We disagree, however, that this language requires the County to spend impact fee funds on improvements to schools directly benefitting the particular new development that paid the impact fee. All the County need prove is that a reasonable connection exists between the expenditure of impact fee funds and the benefit accruing to the new development paying the fee. The Private Act is silent about what benefit the development must receive for the impact fee paid by the particular development to constitute its proportionate share of the costs of public improvements.

The question, then, is what benefit the new development paying the impact fee must receive in order to satisfy the "benefits" prong of the test. In *St. Johns County v. Northeast Florida Builders Association, Inc.*, the Florida Supreme Court considered the validity of an impact fee imposed on new residential development in St. Johns County to fund the construction of new schools. *St. Johns Cnty.*, 583 So. 2d at 636. St. Johns County assessed the impact fee on a county-wide basis after determining that "for every

- 9 -

one hundred units that are built, forty-four new students will require an education at a public school." *Id.* at 638. Applying the dual rational nexus test, the Court noted that "an impact fee to be used to fund new schools is different from one required to build water and sewer facilities or even roads" because "[m]any of the new residents who will bear the burden of the fee will not have children who will benefit from the new schools." *Id.* The Court concluded, however, that the impact fee imposed by St. Johns County satisfied the first prong of the test because the fee was "designed to provide the capacity to serve the educational needs of all one hundred dwelling units." *Id.* at 638-39. The Court further concluded that an impact fee assessed on a countywide basis in order to construct new schools throughout the county as needed would satisfy the second prong of the test, explaining as follows:

> As indicated, we see no requirement that every new unit of development benefit from the impact fee in the sense that there must be a child residing in that unit who will attend public school. It is enough that new public schools are available to serve that unit of development. Thus, if this were a countywide impact fee designed to fund construction of new schools as needed throughout the county, we could easily conclude that the second prong of the test had been met.

*Id.* at 639.

In *Wellington River Hollow, LLC v. King County*, 54 P.3d 213, 215 (Wash. Ct. App. 2002), the Washington legislature adopted statutes authorizing local governments to impose impact fees on new developments. Although not expressly stated, language indicative of the dual rational nexus test appears in the statutes providing that local governments may levy impact fees that:

> (a) Shall only be imposed for system improvements that are reasonably related to the new development;
> (b) Shall not exceed a proportionate share of the costs of system improvements that are reasonably related to the new development; and
> (c) Shall be used for system improvements that will reasonably benefit the new development.

*King Cnty.*, 54 P.3d at 219 (quoting Wash. Rev. Code Ann. § 82.02.050(3). If a local government imposed a school impact fee, the local government was required to "'establish one or more reasonable service areas within which it shall calculate and impose impact fees for various land use categories per unit of development.'" *Id.* at 220 (quoting Wash. Rev. Code Ann. § 82.02.060(6)). The Washington legislature defined "service area" as "'a geographic area defined by a county, city, town, or intergovernmental agreement in which a defined set of public facilities provide service to development within the area.'" *Id.* (quoting Wash. Rev. Code Ann. § 82.02.090(8)).

- 10 -

King County exercised the authority granted by the legislature and imposed an impact fee on new developments in order to fund school improvements. *Id.* at 219. King County established the entire Northshore School District as the reasonable service area for calculating the school impact fee a new development must pay. *Id.* at 220. The revenue collected from the impact fee would be spent on improvements to schools throughout the Northshore School District in accordance with the district's capital facilities plan, which planned improvements "based on projected student enrollment growth." *Id.* at 219.

After being assessed the school impact fee, a developer challenged its validity, arguing that the fee was unjust because it was not reasonably related to the development and because it would fund school improvements that would not reasonably benefit the development. *Id.* The Washington Court of Appeals concluded that the school impact fee was not unjust. In reaching this conclusion, the court determined that, to meet the "reasonably benefit the new development" requirement of the statute, an impact fee "need not be spent on infrastructure that would specifically benefit a particular development." *Id.* Rather, an impact fee "need only provide a general benefit to the entire school district." *Id.* The court explained the developer's benefit as follows:

> The school impact fees are to ensure adequate facilities for the school district as new students enroll. Northshore School District will benefit from the infrastructure improvements set forth in the 1996 Capital Facilities Plan, and the students from [the developer's] development will have adequate facilities to be able to attend.

*Id.* at 219-20.

In *City of Olympia v. Drebick*, the Washington Supreme Court upheld an impact fee imposed to fund transportation improvements on a jurisdiction-wide basis. *City of Olympia*, 126 P.3d at 803, 810. The Court explained that "a reasonable relationship would be achieved between the funded improvements and the individual development if the local government defined a reasonable service area, identified the public facilities therein that would require improvement . . ., and prepared a fee schedule taking into account the type and size of the development seeking approval as well as the type of public facility being funded." *Id.* at 807. The Court further explained that, "for a service area to be reasonable," it is not necessary that every public facility in that service area "directly serve each new development project." *Id.* at 810. Instead, all that is required is that the "improvements *considered as a whole* will benefit the [new] development." *Id.*

Turning to the case at bar, we note that school zones within the County can change from year to year due to shifts in population and enrollment. The boundaries of school zones must be redrawn as growth in one school zone of the County affects the capacity of

school zones elsewhere in the County.  Thus, we find the reasoning of the Florida and Washington courts persuasive and adopt their rationale to determine whether the impact fee imposed by the County satisfies the second prong of the dual rational nexus test.  The Private Act authorized the County to establish procedures for collecting and expending impact fee funds.  In accordance with this authority, the County designated the entire county as the service area and spent impact fee funds on school improvements throughout the County as needed.  As discussed above, to satisfy the "benefits" prong of the test, it is not necessary that the County spend the impact fee funds on improvements to schools that directly benefit a particular development.  All that is necessary is that the County's school impact fee has a reasonable connection to the benefits accruing to a particular development paying the fee.

The County's school impact fee satisfies this requirement.  We agree with the trial court's finding that,

> as a countywide district, the construction of a school anywhere in the district increases the overall capacity of the system. . . . [T]he increase in capacity lowers the student-teacher ratio at each school and the need to utilize portable classrooms.  Each individual student benefits from the decrease in the student-teacher ratio by having a more productive and personal classroom experience.

The particular development paying the impact fee, therefore, benefits from the added capacity to the school system overall.  Thus, a reasonable connection exists between the expenditure of the impact fee funds and the benefit received by the new development paying the fee.

In light of the foregoing, we conclude that the school impact fee imposed by the County satisfies both prongs of the dual rational nexus test and constitutes an authorized fee, not an unauthorized tax.

## II.  Vested Property Rights Act.

Home Builders Association next contends that the Vested Property Rights Act exempts its individual members from assessment of the school impact fee because their development plans had already been approved prior to the County adopting Resolution Nos. 11-16-6 and 11-16-7.  Tennessee Code Annotated section 13-3-413(b) provides as follows:

> A vested property right shall be established with respect to any property upon the approval, by the local government in which the property is situated, of a preliminary development plan or a final development plan where no preliminary development plan is required by ordinance or

regulation or a building permit allowing construction of a building where there was no need for prior approval of a preliminary development plan for the property on which that building will be constructed.  During the vesting period described in subsections (c) and (d), the locally adopted development standards which are in effect on the date of approval of a preliminary development plan or the date of approval of a building permit, as described by this subsection (b), shall remain the development standards applicable to that property or building during the vesting period.

Thus, once property rights have vested in a particular property, the development standards in effect at the time of vesting remain the development standards with which that property must comply.   Development standards subsequently adopted by the local government would not apply to that property.

Home Builders Association asserts that the impact fee constitutes a development standard and, therefore, does not apply to its individual members because their property rights vested prior to the County adopting Resolution Nos. 11-16-6 and 11-16-7.  The question, then, is what is a development standard.  The statute defines "development standards" as follows:

[A]ll locally adopted or enforced standards, regulations or guidelines applicable to the development of property, including, but not limited to, planning; local storm water requirements, layout, design; local construction standards for buildings, streets, alleys, curbs, sidewalks; zoning as provided for in subsection (g); lot size; lot configuration; yard dimensions; and off-site improvements, including public or private infrastructure, in which an applicant may acquire vested rights or vested property rights according to this section[.]

Tenn. Code Ann. § 13-3-413(k)(4).  Although impact fees are not expressly identified as development standards, Home Builders Association asserts that the school impact fee is included in this definition because the fee "is a locally adopted regulation applicable to the development of property in Williamson County."   Home Builders Association correctly points out that, by using the phrase "including, but not limited to," the general assembly clearly intended for the list of relevant "standards, regulations or guidelines applicable to the development of property" to be non-exhaustive. *Id.*; *see also Gragg v. Gragg*, 12 S.W.3d 412, 415 (Tenn. 2000) (stating that when a statutory definition provides that it "includes" specific terms, the "enumerated items are illustrative, not exclusive").  Therefore, our task is to determine whether the General Assembly intended for impact fees to be included among the non-exhaustive list of terms enumerated in the statutory definition of development standards.

- 13 -

To aid in our interpretation of Tenn. Code Ann. § 13-3-413(b), we use the doctrine of *ejusdem generis*. The Tennessee Supreme Court has explained this doctrine as follows:

> Under this doctrine of statutory construction, "where general words follow the enumeration of particular classes of things, the general words will be construed as applying only to things of the same general class as those enumerated." In other words, "'where it clearly appears that the lawmaker was thinking of a particular class of persons or objects, his words of more general description may not have been intended to embrace any other than those within the class.'"

*Sallee v. Barrett*, 171 S.W.3d 822, 829 (Tenn. 2005) (citations omitted). *Ejusdem generis*, therefore, "limits the breadth of the general phrase so that neither the general phrase nor the specific terms are inoperative." *State v. Marshall*, 319 S.W.3d 558, 562 (Tenn. 2010).

Applying this doctrine to Tenn. Code Ann. § 13-3-413(k)(4), we interpret the phrase "including, but not limited to" in reference to the other words or phrases in the statute. Tennessee Code Annotated section 13-3-413(b) provides that the following "standards, regulations or guidelines" constitute development standards: (1) "planning," (2) "local storm water requirements, layout, design," (3) "local construction standards for buildings, streets, alleys, curbs, sidewalks," (4) "zoning as provided for in subsection (g)," (5) "lot size", (6) "lot configuration," (7) "yard dimensions," and (8) "off-site improvements, including public or private infrastructure." All of these provisions pertain to the physical aspects of developing property, especially where and how developments are to be constructed. In other words, they place limits on the physical use of the property. There is no indication that payment of an impact fee places limits on the physical use of developing property. As such, an impact fee is different than the class of "standards, regulations or guidelines" enumerated in Tenn. Code Ann. § 13-3-413(k)(4). We conclude, therefore, that the General Assembly did not intend for the non-exhaustive list of terms in the statutory definition of development standards to include payment of an impact fee.

Although payment of an impact fee is not included in the non-exhaustive list of terms in Tenn. Code Ann. § 13-3-413(k)(4), Home Builders Association argues that the impact fee is a development standard because Tenn. Code Ann. § 66-5-211(b)(3) defines "impact fee" as "a monetary charge imposed by a county or municipal government pursuant to any act of general or local application, *to regulate new development on real property*." (Emphasis added). Thus, Home Builders Association contends, the impact fee constitutes a development standard because it is a "locally adopted . . . regulation . . . applicable to the development of property." Tenn. Code Ann. § 13-3-413(k)(4). We respectfully disagree.

- 14 -

Tennessee Code Annotated section 66-5-211 merely establishes that sellers of residential property must disclose to first-time purchasers the amount of any impact fees or adequate facilities taxes paid on the property. This section of the code bears no relation to the County's authority to impose impact fees or to a developer's vested property rights. In contrast, Section 3.10 of Resolution No. 11-16-6 bears a relation to the County's authority to impose impact fees, and it specifically defines the term "impact fee" as "the fee assessed to a Developer for the proportionate share of the cost of Education Facilities needed to serve the new Development, which is reasonably related to the demand created by new Development, and which is used for Education Facilities that benefit the new development." If the County had intended to use the definition of "impact fee" provided in Tenn. Code Ann. § 66-5-211, it would have done so or, at the very least, it would have incorporated that definition into Resolution No. 11-16-6.

We further note that, as previously discussed, the Tennessee Supreme Court has recognized two distinct purposes for fees: (1) to "regulate[] a specific activity" or (2) to "defray[] the cost of providing a service or benefit to the party paying the fee." *City of Tullahoma*, 938 S.W.2d at 412. Here, section 3 of the Private Act states that the purpose of the act is to authorize the County to impose an impact fee on new development "so as to require the developer to share in the burdens of growth by paying his pro rata share for the reasonably anticipated expansion cost of public improvements generated by the new land development activity." Moreover, sections 4 and 5 of the Private Act provide that the County may perform public improvements "and defray the expense thereof by an impact fee." The General Assembly intended the Private Act to authorize the County to impose impact fees to defray the cost of providing public improvements necessitated by new development, not to regulate new development or the use of land. Thus, use of the term "impact fee" as it is defined in Tenn. Code Ann. § 66-5-211 would be inconsistent with the General Assembly's intent in passing the Private Act. "Any interpretation of the statute that 'would render one section of the act repugnant to another' should be avoided." *In re Estate of Tanner*, 295 S.W.3d 610, 614 (Tenn. 2009) (quoting *Tenn. Elec. Power Co. v. City of Chattanooga*, 114 S.W.2d 441, 444 (Tenn. 1937)). We, like the trial court, can find no basis for incorporating the definition of "impact fee" located in an unrelated statute when Resolution No. 11-16-6 specifically defines the term. The impact fee, therefore, does not constitute a development standard and does not violate Home Builders Association's individual members' vested rights under the Vested Property Rights Act.

In light of the foregoing, we conclude that the trial court did not err in granting summary judgment to the County.

CONCLUSION

- 15 -

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellant, Home Builders Association, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE